## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Case No. 23-14679-MER |
| | ) | |
| BENDED PAGE, LLC | ) | Chapter 11, Subchapter V |
| EIN: 85-2948361 | ) | |
| | ) | |
| Debtor. | ) | |

## SUBCHAPTER V PLAN OF REORGANIZATION

Bended Page, LLC, debtor and debtor in possession ("Debtor"), hereby proposes, pursuant to subchapter V of chapter 11 of Title 11 of the U.S. Code, the following Subchapter V Plan of Reorganization (this "Plan").

## I.      INTRODUCTION

Subchapter V, Chapter 11 of Title 11 of the United States Code ("Subchapter V") is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals.  Subchapter V allows a debtor to retain its assets during administration of a Subchapter V case as debtor-in-possession and following confirmation of a plan as a reorganized debtor or as provided in the plan.  Once the Plan is confirmed by the Bankruptcy Court, the Plan, and all supporting documents attached thereto, is the permanent restructuring of Debtor's financial obligations and is the governing document, or contract, with creditors and owners.

Debtor's Plan divides creditors into Classes[1] of similarly situated creditors.  All creditors of the same Class are treated in a similar fashion.  All ownership interests in Debtor are also classified and treated alike.  Each Class of creditors or Equity Interest holders is either impaired or unimpaired under the Plan.  A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor or Equity Interest holder in the class is entitled.  Alternatively, a claimant is unimpaired if the Plan provides for the cure of a default and reinstatement of the maturity date of the Claim as it existed prior to the default. **IF YOU ARE A CREDITOR OR EQUITY INTEREST HOLDER, YOUR RIGHTS MAY BE IMPAIRED BY THE PLAN.**

The Bankruptcy Court set a bar date establishing **December 27, 2023** as the last date for filing Proofs of Claim for all creditors except governmental units.  The Plan provides that Claims and Equity Interests of all classes shall be allowed only if evidenced by a timely filed Proof of Claim or Equity Interest or which otherwise appear in the schedules filed by Debtor and are not scheduled as disputed, contingent or unliquidated unless subsequently allowed by the Bankruptcy Court.  Creditors may check as to whether or not their Claims have been scheduled

---

[1] All capitalized terms not otherwise defined herein have the meaning set forth in Article III, Definitions.

as disputed, contingent or unliquidated by reviewing the Schedules filed by Debtor with the Bankruptcy Court. Alternatively, creditors may contact counsel for Debtor directly to determine how they have been scheduled.

This Plan and the disclosures contained herein are being provided to all creditors and Equity Interest holders of Debtor. This Plan is subject to confirmation pursuant to section 1191 of the Bankruptcy Code by the Bankruptcy Court. Issues related to the merits of the Plan and its confirmation will be the subject of a Confirmation Hearing pursuant to an Order of the Bankruptcy Court which will be served upon you.

## II.     <u>BACKGROUND</u>

### A.     Brief History of Debtor's Business Operations

**1.     Overview of Debtor.** Debtor owns and operates the Tattered Cover bookstores (the "<u>Tattered Cover</u>") - one of the largest independent retail booksellers in the United States. The Tattered Cover has been an iconic Denver institution and community gathering place for people and the arts since 1971.

Joyce Meskis was the long-time owner and operator of the Tattered Cover for most of its existence. In its earlier years, the Tattered Cover operated from locations in Cherry Creek. Later, the Tattered Cover operated stores in downtown Denver, Southwest Denver, and licensed locations at Denver International Airport. Ms. Meskis sold the Tattered Cover to two individuals in 2015. Debtor purchased the Tattered Cover in December 2020 and grew the Tattered Cover to ten locations (inclusive of three licensed locations at Denver International Airport) on October 16, 2023, which is the date Debtor commenced this bankruptcy case (the "<u>Petition Date</u>"). Debtor's current footprint, and its footprint as it existed on the Petition Date, is described below.

Debtor is a Colorado limited liability company, and its members are mostly locals with deep Colorado roots and an understanding of the importance of the Tattered Cover to the Colorado literary community. Debtor's members also include notable figures in the book and publishing world. Debtor's members have a demonstrated commitment to the survival and success of Tattered Cover. Debtor's members have contributed more than $2 million to Debtor since December 2020.

Debtor is controlled by a six-person board of directors, five of whom are also members of Debtor. Debtor currently has three officers: a Chief Financial Officer, a Chief Operating Officer, and a Chief Executive Officer. Except for Bradford Dempsey, Debtor's Chief Executive Officer, the officers are employees of Debtor. Neither Mr. Dempsey nor the other officers are members of Debtor.

On the Petition Date, Debtor operated seven brick and mortar retail locations around Colorado, including three locations in downtown Denver and locations in Westminster, Aurora, Littleton, and Colorado Springs.[2] Debtor also licenses the name Tattered Cover to a bookseller that operates on each concourse of the Denver International Airport. Each of Debtor's brick and mortar

---

[2] Shortly after the Petition Date, Debtor closed the Colorado Springs, Westminster, and McGregor Square locations. The store closures are discussed below.

locations offers personal service, a large, well-curated selection of new and used books, a newsstand, and gifts. Tattered Cover hosts hundreds of authors, illustrators, public figures, community events, book festivals and school events annually. The larger locations have cafes with free Wi-Fi. Debtor leases all of its retail locations, except the Denver International Airport stores, which are operated through a license with Debtor.

Debtor has two affiliated entities: Bended Page Book Store, LLC ("Book Store") and Bended Page Food & Beverage, LLC ("Food & Beverage"). Conceptually, Book Store was formed to sell books and Food & Beverage was formed to operate the in-house cafes, and Debtor was formed as the parent entity for Book Store and Food & Beverage. In practice, Debtor operates on a consolidated basis as virtually all operating expenses are paid by and through Debtor, with one exception.

Food & Beverage collects revenues from the cafes through a separate point-of-sale system at the Tattered Cover locations that have cafes. The food and beverage revenues are deposited into a Food & Beverage bank account. Food & Beverage reports and pays its sales taxes and then remits all remaining proceeds to Debtor. Food & Beverage does not have its own employees or expenses (beyond sales tax). For tracking purposes, Debtor separately accounts for revenue and expenses of the food and beverage operation. Debtor, Food & Beverage and Book Store file consolidated tax returns.

Debtor's gross 2022 revenues were approximately $10,500,000, largely from the sale of books, gifts, and related items. Less than 10% of Debtor's revenues are from the sale of food and beverages. Debtor sustained a loss of approximately $1,200,000 in 2022.

**2.      Events Leading Up to Subchapter V Case.** Like many retail businesses, the Tattered Cover experienced significant adversity following the stay-at-home orders resulting from the COVID-19 pandemic in March 2020. Although Debtor was able to continue operations (and even subsequently expand its store locations), Debtor was only able to do so in part from the cooperation and assistance Debtor received from various parties, including certain of Debtor's members, landlords and publishers.

Shortly after its acquisition of the Tattered Cover, Debtor successfully negotiated rent deferrals with certain landlords and negotiated payment plans for the debts owed to certain of the publishers. Debtor's members have contributed approximately $2,000,000 since December 2020. In addition, two of Debtor's members and Mr. Dempsey together loaned $300,000 to Debtor on a secured basis.[3]

The business downturn that began in March 2020 has continued to some degree to the present date. Although Debtor now enjoys its numerous locations and its status as one of the largest independent bookstores in the U.S. continues, since March 2020 Debtor's revenues have largely remained flat and Debtor's competition from online sellers has increased. With the opening of the new locations, Debtor's costs of administration have also increased.

Debtor filed this Subchapter V Case only after carefully exploring all of its available options and stretching its available resources thin. Debtor recognizes that the cooperation and

---

[3] As discussed below, Mr. Dempsey waived his right to payment on account of his secured claim.

assistance from third parties is finite. Among other things, Debtor was faced with the need to purchase inventory for the 2023 holiday season and Debtor's credit availability to do so was limited.

The winter holiday season is Debtor's busiest time of year, with monthly revenue approximately doubling in December each year. To gear up for holiday sales, Debtor must generally make substantial purchases from the large publishers in September. Because of substantial debts owed to the publishers, Debtor was generally COD with the publishers on the Petition Date and lacked the cash necessary to purchase sufficient inventory to meet anticipated holiday demand. Debtor filed this bankruptcy case on October 16, 2023 with the goal of obtaining access to cash to enable it to meet the increased holiday demand, reduce expenses, and reorganize its debts to ensure it can serve Colorado for years to come.

After receiving input from other independent booksellers around the country and select employees, Debtor's management has worked closely with the Board to formulate this Plan, and to ensure that Debtor will have adequate capitalization upon emerging from this Subchapter V Case.

**B.     Description of Assets.** Interested parties may obtain detailed information about Debtor's assets from Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 93-99] and Amended Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 187, 189-193] (as may be further amended, the "Schedules"). Debtor's material assets as of the Petition Date are summarized as follows:

| Asset | Value |
|---|---|
| Cash and Cash Equivalents | $79,235.41 |
| Deposits and Prepayments | $238,321.65 |
| Accounts Receivable | $196,063.79 |
| Inventory | $1,828,207.73[4] |
| Furniture, Fixtures, Equipment | $662,120.49[5] |
| Intangibles and Intellectual Property | Unknown |

**C.     Description of Prepetition Liabilities.** Interested parties may obtain detailed information about Debtor's prepetition liabilities from the Schedules. These liabilities are summarized as follows:

---

[4] This value is the estimated retail value of Debtor's inventory.
[5] This estimated value is on a cost basis.

**NOTE THAT UNLESS OTHERWISE SPECIFICALLY ALLOWED IN THIS PLAN OR BY PRIOR COURT ORDER, DEBTOR MAY OBJECT TO ANY CLAIM OR EQUITY INTEREST FILED OR SCHEDULED IN THE CASE. A DESCRIPTION OF THE AMOUNT OF A CLAIM DOES NOT MEAN THAT IT HAS BEEN ALLOWED.**

1. **Priority Claims**. "Priority Claims" are prepetition claims entitled to priority payment under 11 U.S.C. § 507(a), but excluding Administrative Claims and Priority Tax Claims for the purposes of this definition. Debtor is unaware of any unpaid Priority Claims at this time.

2. **Priority Tax Claims**. "Priority Tax Claims" are claims of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8). Debtor did not schedule any Priority Tax Claims and does not believe that any such Claims exist.

3. **Secured Claims**. On the Petition Date, Debtor had five secured lenders, with a total secured debt of approximately $820,000, excluding lease debt secured by deposits.

a. Ingram Book Group LLC ("Ingram") filed a UCC-1 financing statement on January 13, 2021, identifying its collateral as accounts, inventory, rights to payment, and money. On October 30, 2023, Ingram filed a proof of claim asserting a Secured Claim in the amount of $233,000 [Claim No. 12-1] (Class 2 in this Plan).

b. Alpine Bank filed a UCC-1 financing statement on October 24, 2022, identifying its collateral as all of Debtor's assets, including inventory, accounts and goods, among other property. Alpine filed a proof of claim asserting a Secured Claim in the amount of $48,405. Alpine's Secured Claim and has been paid in full pursuant to the DIP Financing Order (defined below).

c. B.S.D. Capital, Inc., dba Lendistry ("Lendistry") filed a UCC-1 financing statement on January 23, 2023, identifying its collateral as inventory, equipment, accounts, chattel paper, and instruments, among other property. On December 13, 2023, Lendistry filed a proof of claim asserting a Secured Claim in the amount of $222,638.57 (Class 3 in this Plan).

d. Yesco Financial Solutions LLC ("Yesco") filed a UCC-1 financing statement on June 7, 2021, identifying its collateral as an LED sign. On October 24, 2023, Yesco filed a proof of claim and asserted a Secured Claim in the amount of $12,128.96 (Class 4 in this Plan).

e. On July 18, 2023, Debtor's Board of Directors adopted a resolution authorizing Debtor to sell secured promissory notes convertible into membership interests for gross proceeds of up to $300,000 in a private transaction intended to be exempt from registration under the Securities Act of 1933. Consistent with the resolution, on July 18, 2023, Debtor executed three convertible secured promissory notes (together, the "Convertible Notes"). The Convertible Notes are secured pursuant to a UCC-1 financing statement filed on September 28, 2023, which indicates that the holders of the Convertible Notes hold a security interest in all of Debtor's assets. The holders of the Convertible Notes are as follows:

A.     Convertible Secured Promissory Note in the amount of $200,000 payable to the Leslie J. Rainbolt Revocable Trust (the "Rainbolt Trust");

B.     Convertible Secured Promissory Note in the amount of $75,000 payable to Margie Gart ("Gart"); and

C.     Convertible Secured Promissory Note in the amount of $25,000 payable to Mr. Dempsey. Mr. Dempsey has waived his claim for the portion of the Convertible Notes owed to him.

The Secured Claims of the Rainbolt Trust and Gart have been rolled up into the DIP Loan and are deemed satisfied in accordance with the terms of the DIP Financing Order.

    **4.**     **Unsecured Claims.** The Claims of Debtor's unsecured creditors are described as follows:

Administrative Convenience Claims (Class 5):

    Of Debtor's approximately 400 creditors, Debtor has approximately 350 unsecured creditors with Unsecured Claims under $7,500. These unsecured creditors include, among other creditors, gift vendors, authors, and suppliers for its cafes. Claims Class 5 total $262,474.

General Unsecured Claims (Class 6)

    Claims in Class 6 are comprised of Debtor's unsecured creditors with claims of more than $7,500. There are five categories of creditors in this class, each of which is described below.

- Claims of large (over $200,000) publishers and wholesalers from whom Debtor purchases inventory

- Claims of Debtor's landlords

- Claims of former management and owners

    In December 2020, Debtor acquired the assets of Tattered Cover pursuant to an Asset Purchase Agreement with Tattered Cover, Inc. The purchase price was $400,000 in cash payable as follows: $40,000 at closing, and periodic cash payments in the amount of $360,000.[6] On the Petition Date, Debtor owed Tattered Cover, Inc. $215,000. The owners of Tattered Cover, Inc. (Kristin Gilligan and Len Vlahos) filed individual claims for approximately $62,000 related to employment agreements with Debtor.

    Kwame Spearman was Debtor's former chief executive officer. Debtor believed that Mr. Spearman claimed he was owed upwards of $198,000 for paying for store expenses which he charged on his personal cards and advancing cash to Debtor. Therefore, Debtor listed Mr.

---

[6] Debtor was also required to reimburse the seller for certain expenses.

Spearman as a creditor with a contingent, unliquidated, and disputed claim in the amount of $198,089.00 [Docket No. 190]. On December 7, 2023, Mr. Spearman filed a proof of claim and asserted a claim in the amount of $242,467.67 for "month loaned to business; reimbursements." [Claim No. 36-1]. Mr. Spearman also filed a proof of claim in the amount of $225,000 for "employee disputes." [Claim No. 38-1]. Debtor is evaluating the merits of each of Mr. Spearman's claims and reserves all rights to object to each claim.

- Unredeemed Gift Cards:

Debtor sells pre-paid gift cards for use towards the purchase of products sold at the Tattered Cover bookstores. In some cases, the gift cards are not timely redeemed ("Unredeemed Gift Cards"). Under Colorado law, gift cards are presumed abandoned if they are not redeemed within 5 years after the later of the date the gift card was purchased or the date the gift card was last used. Colo. Rev. Stat. § 38-13-207. Generally, holders of unredeemed gift cards must report and turn over the value of these cards to the state. C.R.S. §§ 38-13-401, 38-13-402, 38-13-403, 38-13-603. However, businesses with annual gross receipts from the sales or issuance of all unredeemed gift cards totaling $200,000 or less are not required to report or pay the value of such cards to the state. C.R.S. § 38-13-219. On the Petition Date, Debtor believes that the value of all Unredeemed Gift Cards was approximately $375,563.82. Debtor notes that it will continue to honor all unused Tattered Cover gift cards and customer program benefits, consistent with the authority Debtor received in the bankruptcy case.

- All other creditors holding General Unsecured Claims, being those creditors not in any of the above categories whose Claims exceed $7,500.

A list of General Unsecured Claims by category and amount is attached hereto as **Exhibit A**.

## D.    Filing of Subchapter V Case and First Day Motions

Debtor filed this Subchapter V case (the "Subchapter V Case") on October 16, 2023, in the Bankruptcy Court. On October 17, 2023, Mark D. Dennis was appointed as the Subchapter V trustee [Docket No. 30] (the "Subchapter V Trustee").

On the Petition Date, Debtor filed its "first day" motions, requesting emergency relief necessary to maintain and continue its non-profit operations in the ordinary course [Docket Nos. 13, 14, 15, 18, 19, and 20]. After the first day hearing on October 19, 2023 [Docket No. 44], the Bankruptcy Court entered the following orders:

a.   Order Granting Debtor's Motion for Entry of Order Authorizing Debtor to (A) Continue Customer Practices, Including Honoring Prepetition Gift Cards, Customer Programs, and Refund Policy; and (B) Sell Gift Cards Postpetition [Docket No. 45];

b.   Order Granting Motion for Entry of Order Authorizing Debtor to Pay Prepetition Sales and Other Taxes and Obligations and for Related Relief [Docket No. 46];

c.      Interim Order (I) Authorizing Use of Cash Collateral; (II) Granting Adequate Protection; (III) Setting a Final Hearing on Use of Cash Collateral; and (IV) Granting Related Relief [Docket No. 57];

d.      Order Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, and Other Compensation; (B) Continue Employee Benefit Programs; and (C) For Related Relief [Docket No. 58]; and

e.      Interim Order Granting Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor-In-Possession Financing.[Docket No. 59].[7]

After Debtor provided notice to interested parties, the Bankruptcy Court also entered the following orders:

a.      Order Approving Motion for Entry of Order Authorizing Debtor to Implement Severance Plan and Make Severance Payments [Docket No. 80]; and

b.      Order Granting Debtor's Motion to Approve Brad Dempsey Consulting LLC and Bradford Dempsey as Chief Executive Officer Pursuant to 11 U.S.C. § 363 [Docket No. 170].

After a hearing on November 13, 2023 [Docket No. 134], the Bankruptcy Court entered the following orders on a final basis:

a.      Second Interim Order (I) Authorizing Use of Cash Collateral; (II) Granting Adequate Protection; (III) Setting a Final Hearing on Use of Cash Collateral; and (IV) Granting Related Relief [Docket No. 57]; and

b.      Final Order Granting Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor-In-Possession Financing (the "DIP Financing Order"). [Docket No. 141].

As part of its first day motions, Debtor requested Bankruptcy Court approval of a debtor-in-possession loan in the amount of up to $1,275,000 (the "DIP Loan") (Class 1 in this Plan) to fund, among other things, inventory purchases, operating costs, and certain moving and business transition expenses. The lender is Read Colorado, LLC (the "DIP Lender"). The members of the DIP Lender are the Rainbolt Trust and Gart, both of whom are members of Debtor and both of whom are holders of Convertible Notes. The DIP Loan is a multiple-draw term loan that has been and will be made available to Debtor upon satisfaction of certain Milestones (as defined in the DIP Financing Motion). The DIP Loan is secured by the protections afforded under Sections 364(c)(1)-(3) of the Bankruptcy Code. The DIP Loan matures on the Effective Date of the Plan and is convertible at the sole discretion of the Lender into a newly authorized class of Debtor's preferred stock ranking senior in right of distribution and liquidation to all other classes of stock issued by Debtor in accordance with the terms and conditions set forth in the Second Amended and Restated Operating Agreement attached hereto as Exhibit C-2. To the extent the DIP Lender exercises its

---

[7] The DIP Financing Motion is discussed further below.

Conversion Right, the Second Amended and Restated Operating Agreement shall become effective and binding upon the Debtor.

## E.     Employment of Professionals

On October 16, 2023, Debtor filed its Application to Employ ONSAGER | FLETCHER | JOHNSON | PALMER LLC ("OFJP") as its counsel in this Subchapter V Case, which the Bankruptcy Court granted on November 7, 2023 effective as of October 16, 2023. OFJP has not yet filed a fee application in Debtor's Subchapter V Case.

On October 16, 2023, Debtor filed its Motion to Approve Brad Dempsey Consulting LLC and Bradford Dempsey as Chief Executive Officer Pursuant to 11 U.S.C. § 363, which the Bankruptcy Court granted on December 12, 2023. Pursuant to the terms of the order approving Mr. Dempsey as Chief Executive Officer, Mr. Dempsey files monthly statements of his hours worked with descriptions of tasks performed. Mr. Dempsey is not required to file fee applications.

On October 25, 2023, Debtor filed its Application to Employ Littler Mendelson, P.C. ("Littler") as special employment counsel, which the Bankruptcy Court granted on November 27, 2023, effective as of October 25, 2023. Littler has not yet filed a fee application in Debtor's Subchapter V Case.

Debtor anticipates employing two separate accounting firms. Prior to the Petition Date, Plante & Moran, PLLC prepared and filed Debtor's state and federal tax returns and performed associated accounting work. Debtor anticipates filing a motion to employ Plante & Moran to assist Debtor with its 2023 tax returns and associated obligations. Prior to the Petition Date, the accounting firm Watson Coon Ryan, LLC assisted Debtor with its annual obligation to audit the 401(k) plan Debtor sponsors. Debtor anticipates filing a motion to employ Watson Coon Ryan to assist with the 2024 401(k) audit.

## F.     Significant Postpetition Events

Debtor's primary objective in this Subchapter V Case is to put Tattered Cover on a smaller, financially sustainable platform that will ensure its ability to serve the Colorado community for years to come. In furtherance of that objective, shortly after the Petition Date, Debtor ceased operations at three brick-and-mortar locations: Colorado Springs, McGregor Square, and Westminster. Debtor filed motions to reject its leases for each of these three locations [Docket Nos. 12, 16, and 17]. The motions to reject the McGregor Square and Westminster leases were granted [Docket Nos. 109 and 161]. Debtor also entered into settlement agreements with its landlords for the Colorado Springs and McGregor Square locations [Docket Nos. 107, 174], which provided for the rejection of those leases. The Court approved each of the settlements [Docket Nos. 173, 204].

As a part of closing three stores, Debtor laid off approximately 25 employees from those stores, some of whom had worked for Tattered Cover for decades. Debtor requested and the Court approved a severance package [Docket Nos. 48 and 80].

Debtor continues to cut administrative costs wherever possible. For example, Debtor filed a motion to reject an employment agreement with the principal of Debtor's predecessor [Docket No. 89], which was granted on November 27, 2023 [Docket No. 150].

### III.   DEFINITIONS

1.   <u>Administrative Claim</u>: Any Claim for costs and expenses of administration under Sections 503(b), 507(b) or 1114(e)(2), including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the estate and operating the business of any Debtor (including wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under Sections 330(a) or 331; and (c) all fees and charges assessed against the estate under chapter 123 of Title 28 United States Code, 28 U.S.C. §§ 1911-1930.

2.   <u>Administrative Convenience Claim</u>: All Unsecured Claims which are $7,500 or less and are not Large Publisher Claims, Lease/Note Claims or Other Unsecured Claims, unless the holders of any Claims in such Classes chose to reduce their respective Claims and opt into this Class in accordance with Article IV, paragraph E7.

3.   <u>Allowed</u>: When used in connection with a Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by Debtor in its Schedules as other than Disputed and as to which a party in interest has not filed a timely objection; (b) a POC which was filed on or before the Claims Bar Date, or filed after such date with leave of the Bankruptcy Court, to which a timely objection has not been filed to such claim; (c) a Claim that has been allowed by a Final Order, or by stipulation as to the amount and nature of Claim executed with Debtor on or after the Effective Date; (d) a Claim relating to a rejected executory contract or unexpired lease as to which a party in interest has not filed a timely objection, or has been allowed by a Final Order, in either case only if a POC has been filed within 30 days from the Confirmation Date or has otherwise been deemed timely filed under applicable law; or (e) a Claim that is allowed pursuant to the terms of this Plan.

4.   <u>Available Cash</u>: Cash available to Debtor after the Effective Date which is not Projected Disposable Income, and expressly does not include further equity infusions from any of the Debtor's members or any unused proceeds from draws received under the DIP Financing Order.

5.   <u>Bankruptcy Code</u>: The Bankruptcy Reform Act of 1978, Title 11 of the United States Code, as amended from time to time, as set forth in Sections 101 *et seq.* of Title 11 of the United States Code, and applicable portions of Titles 18 and 28 of the United States Code. All references to "Section" are references to sections of the Bankruptcy Code.

6.   <u>Bankruptcy Court</u>: The United States Bankruptcy Court for the District of Colorado or any other court of the United States with authority over this bankruptcy case.

7.    <u>Book Store</u>: Bended Page Book Store, LLC, as defined in Article II, paragraph A1.

8.    <u>Claim</u>: A claim (as defined in 11 U.S.C. § 101(5)) against Debtor, including: (a) any right to payment from a debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmeasured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmeasured, disputed, undisputed, secured or unsecured. "Claim" shall not include unmatured or unearned interest as of the Petition Date on the amount of any Claim except as permitted by the Bankruptcy Code or except as expressly provided otherwise in this Plan.

9.    <u>Claims Bar Date</u>: December 27, 2023.

10.    <u>Class</u>: A category of holders of Claims or Equity Interests as set forth in Article IV of the Plan.

11.    <u>Confirmation Date</u>: The date on which the Bankruptcy Court enters the Confirmation Order.

12.    <u>Confirmation Order</u>: The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

13.    <u>Convenience Claim Election</u>: See definition in Article IV, paragraph C7.

14.    <u>Conversion Notice</u>: A written notice issued by the DIP Lender to Debtor which shall sufficiently detail the DIP Lender's exercise of its Conversion Right.

15.    <u>Conversion Right</u>: The right held by the DIP Lender to convert the DIP Loan Claim into a newly issued class of senior-preferred equity of Debtor in accordance with the terms of the Second Amended and Restated Operating Agreement attached to the Plan as Exhibit C-2.

16.    <u>Conversion Right Deadline</u>: The deadline for the DIP Lender to exercise its Conversion Right which, unless otherwise agreed to in writing with Debtor and the DIP Lender, shall be three (3) days from the date the Bankruptcy Court holds its first hearing on confirmation of this Plan.

17.    <u>Convertible Notes</u>: See definition in Article II, paragraph C3e.

18.    <u>Debtor</u>: Bended Page, LLC, which definition includes such entity as reorganized pursuant to this Plan.

19.    <u>Deficiency Claim</u>: That portion of a Claim that exceeds the value of the interest of the holder of such Claim in Debtor's interest in property subject to a Lien.

20. <u>DIP Financing Order</u>: The Final Order entered by the Bankruptcy Court approving the DIP Loan at Docket No. 141.

21. <u>DIP Lender</u>: Read Colorado, LLC, as defined in Article II, paragraph D.

22. <u>DIP Loan</u>: The debtor-in-possession loan in the amount of up to $1,275,000 on the terms and conditions set forth in the DIP Loan Agreement and DIP Loan Security Agreement that were approved by the DIP Financing Order.

23. <u>DIP Loan Claim</u>: The Claim held by the DIP Lender which shall consist of the total obligations due and owing under the DIP Financing Order and the debtor-in-possession financing agreement and security agreement approved by the DIP Financing Order.

24. <u>Discharge Order</u>: See definition in Article VIII, paragraph Be.

25. <u>Disputed Claim</u>: Any Claim: (a) listed on the Schedules as unliquidated, disputed or contingent; or (b) as to which Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

26. <u>Effective Date</u>: The first  day after the Confirmation Date, or, if an appeal is taken and the Confirmation Order is stayed, the first business day after the later of the date (a) the stay expires by its own terms, or (b) the order vacating or terminating the stay becomes a Final Order.

27. <u>Enjoined Claim</u>: All entities and persons, and any successor, assigns or representatives of such entities and persons, who have held, hold, or may hold Claims, rights, causes of action, liabilities, or any other interests based on any act or omission, transaction, or other activity of any kind or nature related to Debtor or the Subchapter V Case that occurred prior to the Effective Date. See definition in Article IX, paragraph H1.

28. <u>Equity Interest</u>: Any legal or beneficial equity interest in Debtor as of the Petition Date, together with any warrants, options or contract rights to purchase or acquire such interests at any time, including without limitation (a) common and preferred Class A membership interests, as set forth on **Exhibit B**, (b) any rights to acquire equity interests under any Restricted Membership Interest Grant Agreements and Debtor's equity plan (if any), and (b) any profit interest rights under any Profits Interest Grants Agreements.

29. <u>Final Order</u>: An order no longer subject to appeal, review or certiorari proceedings.

30. <u>Food & Beverage</u>: Food & Beverage, LLC, as defined in Article II, paragraph A1.

31.     Gart: Ms. Margie Gart, an Equity Interest holder and member of the DIP Lender, as described in Article II, paragraph C3e.

32.     General Unsecured Claims: Non-priority Unsecured Claims other than Administrative Convenience Class Claims, including Claims arising from the rejection of executory contracts and/or unexpired leases with landlords.

33.     Ingram: Ingram Book Group, LLC, as defined in Article II, paragraph C3a.

34.     Lendistry: B.S.D. Capital, Inc., dba Lendistry, as defined in Article II, paragraph C3c.

35.     Lien: A lien, security interest or charge against property to secure payment of a debt or performance of an obligation, whether obtained by consensual means or by judgment, levy, sequestration, or other legal or equitable process or proceeding.

36.     Littler: Littler Mendelson, P.C., Debtor's special employment counsel as described in Article II, paragraph E.

37.     OFJP: ONSAGER | FLETCHER | JOHNSON | PALMER LLC, Debtor's bankruptcy counsel as described in Article II, paragraph E.

38.     Person: As defined in 11 U.S.C. § 101(41).

39.     Petition Date: October 16, 2023.

40.     Priority Claims: Prepetition unsecured claims entitled to priority in payment, as defined in Article II, paragraph C1.

41.     Priority Tax Claims: A Claim against any Debtor of a governmental unit of the kind specified in 11 U.S.C. § 507(a)(8).

42.     Projected Disposable Income or PDI: This term has the meaning set forth in Article IV, paragraph B7.

43.     Projections: See definition in Article IV, paragraph B7.

44.     Rainbolt Trust: The Leslie J. Rainbolt Revocable Trust, an Equity Interest holder and member of the DIP Lender, as described in Article II, paragraph C3e.

45.     Required Expenses: See definition in Article IV, paragraph B7.

46.     Schedules: The Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 93-99] and Amended Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 187, 189-193], which were filed by Debtor with the

Bankruptcy Court pursuant to Bankruptcy Rule 1007, as such schedules may be amended or supplemented from time to time pursuant to Bankruptcy Rule 1009.

47. <u>Secured Claim</u>: A Claim (a) that is secured by a Lien on property in which the Debtor's estate has an interest, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under 11 U.S.C. § 553 or avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value of the Claim holder's interest in the estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to 11 U.S.C. § 506(a), or (b) Allowed under this Plan as a Secured Claim, including capital leases.

48. <u>Senior Preferred Class:</u> See definition in Article IV, paragraph B3.

49. <u>Subchapter V Case</u>: Case No. 23-14679 MER, as defined in Article II, paragraph D.

50. <u>Subchapter V Trustee</u>: Mark D. Dennis, as defined in Article II, paragraph D.

51. <u>Tattered Cover</u>: Tattered Cover bookstores, as defined in Article II, paragraph A1.

52. <u>Unredeemed Gift Cards</u>: See definition in Article II, paragraph C4.

53. <u>Unsecured Claim</u>: Any Claim against any Debtor that is not a Secured Claim, Administrative Claim or Priority Claim, or including Claims arising from the rejection of executory contracts and/or unexpired leases, Deficiency Claims, and any allegedly secured but unperfected Claims that are not otherwise dealt with in this Plan.

54. <u>Yesco</u>: Yesco Financial Solutions LLC, as defined in Article II, paragraph C3d.

## IV.   **PLAN CLASSES, TREATMENT AND MEANS FOR IMPLEMENTATION**

### A. Summary of the Plan

| Class | Description | Estimated Amount[8] | Treatment | Voting Rights |
|---|---|---|---|---|
| N/A | Administrative Expense Claims | $110,000 | See paragraph C1 below. | No voting rights |

---

[8] The estimated aggregate Claim amounts assume an Effective Date of _____, 2024.

| Class | Description | Estimated Amount[8] | Treatment | Voting Rights |
|---|---|---|---|---|
| N/A | Priority Tax Claims | None | If any, payment equal to the Allowed Claims from Available Cash on or as soon as reasonably practicable after the Effective Date. | No voting rights |
| 1 | DIP Loan Claim (Secured) | $ 1,275,000 | DIP Lender shall receive, depending upon whether the Conversion Right is exercised by the Conversion Right Deadline, either: (a) issuance of the Senior-Preferred in accordance with the Second Amended and Restated Operating Agreement, or (b) shall retain its Liens against the Debtor's assets. and be repaid upon a sale of the Debtor's assets as provided for herein. | Impaired; entitled to vote |
| 2 | Ingram Claim (Secured) | $233,000 | Payment will be made in accordance with existing transaction documents from PDI. | Unimpaired; not entitled to vote |
| 3 | Lendistry Claim (Secured) | $232,638 | Payment will be made in accordance with existing transaction documents from  PDI. | Unimpaired; not entitled to vote |
| 4 | Yesco Claim (Secured) | $12,128 | Payment will be made in accordance with existing transaction documents from  PDI. | Unimpaired; not entitled to vote |
| 5 | Administrative Convenience Claims (Unsecured Claims of $7,500 or less) | $262,474 | Payment of  20% of the Allowed Claims from Available Cash as soon as reasonably practicable after the Effective Date. | Impaired; entitled to vote |
| 6 | General Unsecured Claims | $3,195,341.62 | Allowed Claims to be paid pro rata from PDI in quarterly installments over three years from the Effective Date. | Impaired; entitled to vote |
| 7 | Equity Interests | N/A | Cancelled and extinguished as of the Effective Date; have the opportunity to purchase Senior Preferred Class equity interests after Confirmation | Impaired; entitled to vote |

B.    **Means for Implementation**

1.    **Vesting of Assets in Debtor.** In the event that the DIP Lender exercises its Conversion Right, then on the Effective Date, title to Debtor's assets and property, including all claims, causes of actions and other interests shall be vested in Debtor, as reorganized by this Plan, free and clear of any liens, claims, interests or encumbrances (except as set forth in this Plan). In the Event that the DIP Lender does not exercise its conversion right, then Debtor's assets and property shall remain property of the estate.

2.    **Existing Equity Interests.** On the Effective Date, and provided that the DIP Lender exercises its Conversion Right by issuing a Conversion Notice, all of the existing and outstanding Equity Interests in Debtor shall be extinguished and cancelled.  Holders of existing and outstanding Equity Interests shall have the option to purchase units in Debtor for a period of sixty (60) days post-Effective Date in accordance with the terms of the Second Amended and Restated Operating Agreement attached hereto as **Exhibit C-2** which shall become effective and binding upon Debtor. If the DIP Lender does not issue its Conversion Notice by the Conversion Right Deadline, then all holders of Equity Interests in Debtor shall retain such interests in accordance with Debtor's governing documents and the Second Amended and Restated Operating Agreement shall not become effective and binding upon the Debtor.

3.    **Issuance of New Equity in the Event of Conversion Right Exercise.** On the Effective Date, and provided that the DIP Lender has exercised its Conversion Right by issuing a Conversion Notice, the DIP Loan Claim shall convert to a newly authorized class of Debtor's preferred membership interests called the "Senior Preferred Class," constituting 100% of the Senior Preferred Class in accordance with the terms of the Second Amended and Restated Operating Agreement attached hereto as **Exhibit C-2**. From the Effective Date for a period of 60 days, and as more fully set forth in the Second Amended and Restated Operating Agreement, the holders of the former Class A preferred and common Equity Interests, which will have been cancelled in accordance with the terms of this Plan, shall have the option to purchase common membership interests, with a minimum buy-in of $50,000.

4.    **Non-Exercise of Conversion Right**.  If the DIP Lender has not exercised its Conversion Right by the Conversion Right Deadline, then, the Debtor shall commence a comprehensive marketing and competitive sale process for a sale of substantially all of its assets, pursuant to 11 U.S.C. §§ 363(b), (f) and 365, which shall be completed no later than December 31, 2024 (the "Sale Process Scenario").  All holders of Secured Claims shall each retain their Liens against the Debtor's assets, in accordance with their relative priority under applicable law, and such Liens shall attach to the sale proceeds and shall be subsequently distributed to holders of Secured Claims upon further order of the Court.

5.    **Governing Documents.** Debtor's Certification of Organization shall be amended to provide that the issuance of nonvoting equity securities are prohibited, substantially in the form and substance of **Exhibit C-1** hereto.  Further, provided that the Conversion Right has been exercised by the Conversion Right Deadline, the existing First Amended and Restated Operating Agreement of Debtor shall be amended and restated as necessary to satisfy the provisions of this

Plan, substantially in the form and substance of the Second Amended and Restated Operating Agreement attached as **Exhibit C-2** hereto.

6. **Management.** Debtor's post-confirmation management will be Bradford E. Dempsey (Chief Executive Officer), Margie Keenan (Chief Financial Officer), and Jeremy Patlen (Chief Operating Officer). On December 12, 2023, Debtor filed its Motion to Approve 2024 Compensation Terms for Brad Dempsey Consulting LLC and Bradford Dempsey as Chief Executive Officer Pursuant to 11 U.S.C. § 363 [Docket No. 177] (the "2024 Compensation Motion"). In the 2024 Compensation Motion, Debtor requests authority to pay Mr. Dempsey $10,000 per month, plus reimbursement of expenses incurred, during 2024. The 2024 Compensation Motion remains pending. Margie Keenan and Jeremy Patlen will receive annual compensation and benefits substantially consistent with their prepetition annual compensation and benefits. Debtor's post-confirmation directors will be _____. Debtor will retain all of its current employees.

7. **Projected Disposable Income.** Attached as **Exhibit D** is the projected disposable income of Debtor (the "Projected Disposable Income") for the next three (3) years and the underlying assumptions supporting those financials (the "Projections"). Disposable income is the total income projected to be received by Debtor that is not reasonably necessary to be expended for the continuation, preservation, or operation of the businesses of Debtor ("Required Expenses"). Required Expenses include, without limitation, the purchase of inventory, payments to holders of Administrative Claims, payments to holders of Claims in Classes 2, 3 and 4, taxes, payroll, insurance, building rental expenses, programming expenses, administrative expenses, fees and expenses of attorneys, accountants and other professionals, supplies and capital expenditures.

Debtor's Projected Disposable Income will be used for distributions to creditors as set forth herein. As the Projections reflect, the total estimated amount of distributions over the three-year period from the Plan Effective Date through _____ is $_____ to secured creditors, and $ _____ to Unsecured Creditors.

To the extent Available Cash is used to pay Claims in any year, the amount of such Available Cash shall be a credit against the amount of Projected Disposable Income required to be paid in that same year.

8. **Recapitalization.** Debtor, as agent on behalf of the holders of Claims entitled to receive distributions under the Plan, agrees to report to the extent applicable, for federal income tax purposes, the transaction described in paragraphs B2 and 3 of this Article as a recapitalization under Section 368(a)(1)(c) of the Internal Revenue Code, and Debtor shall not adopt any tax filing position that is inconsistent with the position required under this paragraph.

## C.     Treatment of Claims

1. **Administrative Claims.** Under § 1123(a)(1), Administrative Claims are not classified and are not entitled to vote on the Plan.

a.     Administrative Claims of Professionals. Unless otherwise agreed between Debtor and the holder of a professional fee Administrative Claim, each such holder shall receive

payment from Debtor of such Claim from Available Cash, on the later of (i) the Effective Date; or (ii) as soon as reasonably practicable after such Claim is approved by the Bankruptcy Court. All motions and applications seeking allowance of Administrative Claims shall be filed within sixty (60) days of the Effective Date or shall be deemed disallowed and forever barred.

Unpaid Administrative Claims of professionals are estimated to be $_____ as of the Effective Date, as follows:

OFJP            $ _____
Littler:        $ _____

Debtor does not believe that the Subchapter V Trustee will hold an unpaid Administrative Claim on the Effective Date.

b.      Ordinary-Course Administrative Claims. Administrative Claims resulting from transactions within the ordinary course of Debtor's business during this Subchapter V Case shall be paid in full in the ordinary course of business when due. Holders of ordinary course Administrative Claims shall not be required to file a request for payment of such Claims with the Bankruptcy Court.

c.      Reclamation Claims.[9] Under the Bankruptcy Code (and subject to certain exceptions), a seller of goods who has sold goods to a debtor within 21-45 days of the Petition Date and while a debtor was insolvent may reclaim such goods. Penguin Random House made a demand for reclamation of goods in the amount of $113,059.24, but did not file a motion for allowance of an administrative claim pursuant to 11 U.S.C. § 503. Penguin Random House filed an unsecured claim and asserted a priority claim in the amount of $55,620.83 pursuant to 11 U.S.C. § 503(b)(9). Debtor will pay this claim quarterly from Projected Disposable Income over a period of three (3) years, commencing as soon as reasonably practicable after the Effective Date.

**2.      Priority Tax Claims**. Under § 1123(a)(1), Priority Tax Claims are not classified and are not entitled to vote on the Plan. Unless otherwise agreed, Allowed Priority Tax Claims shall receive payment in full from Available Cash, as soon as reasonably practicable after the Effective Date, or within twenty (20) business days after the date the Priority Tax Claim becomes an Allowed Claim. In accordance with Section 1123(a)(1), Priority Tax Claims are not designated as a Class and are not entitled to vote. Debtor does not believe there are any Priority Tax Claims.

**3.      Class 1.  DIP Loan Claim.** On the Effective Date, and provided that the DIP Lender has exercised its Conversion Right by issuing a Conversion Notice, the DIP Loan Claim shall convert to membership interests in Debtor's newly issued Senior Preferred Class, as set forth in Article IV, paragraph B3, and in accordance with the Second Amended and Restated Operating Agreement. Upon such conversion, the DIP Lender's Lien on Debtor's assets shall be deemed released.  If the DIP Lender has not exercised its Conversion Right by the Conversion Right Deadline, then, on the Effective Date, the Debtor shall commence the Sale Process with the DIP

---

[9] For convenience, reclamation Claims arising from both 11 U.S.C. §§ 503(b)(9) and 546(c) are being treated similarly. Nothing in this Plan shall be an admission as to the validity or enforceability of any reclamation Claim and Debtor reserves all rights to challenge any such Claims at a later date.

Lender's Liens being retained against the Debtor's assets, along with their relative priority, in accordance with the DIP Financing Order and such Liens shall further attach to any sale proceeds generated by the Debtor.  Any sale proceeds received by the Debtor during the Sale Process shall not be distributed until further order of the Court regarding same.  In the event that the Debtor commences the Sale Process, the DIP Loan Claim shall accrue interest at the default rate of 17% as provided for in the DIP Loan Agreement.  The DIP Lender shall have the right to credit bid, pursuant to 11 U.S.C. § 363(k), any portion of the DIP Loan Claim during the Sale Process.

4.      **Class 2.  Ingram Claim**. Class 2 consists of the Secured Claim of Ingram which shall be Allowed in the amount of all principal and accrued interest at the non-default contractual rate as of the Effective Date. As of the Effective Date, the existing transaction documents between Ingram and Debtor shall be deemed to be in full force and effect. Ingram shall retain its Lien on those assets of Debtor described in its transaction documents. This Claim will be paid by Debtor from Projected Disposable Income on the terms set forth in the transaction documents.  To the extent that Debtor sells its assets as part of a coordinated sale process under this Plan, Ingram shall retain its Lien against such assets, along with its relative priority, and such Lien shall further attach to any sale proceeds generated by the Debtor.  Any sale proceeds generated by the Debtor shall not be distributed until further order of the Court.  Ingram shall be conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and shall not be entitled to vote to accept or reject the Plan on account of such Claim.

5.      **Class 3. Lendistry Claim**.  Class 3 consists of the Secured Claim of Lendistry, which shall be Allowed in the amount of all principal and accrued interest at the non-default contractual rate as of the Effective Date. As of the Effective Date, the existing transaction documents between Lendistry and Debtor shall be deemed to be in full force and effect.  Lendistry shall retain its Lien on those assets of Debtor described in its transaction documents. This Claim will be paid from Projected Disposable Income on the terms set forth in the transaction documents. To the extent that Debtor sells its assets as part of a coordinated sale process under this Plan, Lendistry shall retain its Lien against such assets, along with its relative priority, and such Lien shall further attach to any sale proceeds generated by the Debtor.  Any sale proceeds generated by the Debtor shall not be distributed until further order of the Court.  Lendistry shall be conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and shall not be entitled to vote to accept or reject the Plan on account of such Claim.

6.      **Class 4. Yesco Claim.** Class 4 consists of the Secured Claim of Yesco, which shall be Allowed in the amount $12,128.96. As of the Effective Date, the existing transaction documents between Yesco and Debtor shall be deemed to be in full force and effect. Yesco shall retain its Lien on those assets of Debtor described in its transaction documents. This Claim will be paid from Projected Disposable Income on the terms and the dates set forth in the transaction documents.  To the extent that Debtor sells its assets as part of a coordinated sale process under this Plan, Yesco shall retain its Lien against such assets, along with its relative priority, and such Lien shall further attach to any sale proceeds generated by the Debtor.  Any sale proceeds generated by the Debtor shall not be distributed until further order of the Court.  Yesco shall be conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and shall not be entitled to vote to accept or reject the Plan on account of such Claim.

7.    **Class 5.   Administrative Convenience Claims**.   Class 5 consists of Allowed Administrative Convenience Claims, being Unsecured Claims equal to or less than $7,500. Holders of these Claims shall receive payment by Debtor from Available Cash equal to twenty percent (20%) of the Allowed amount of such Claims, on or as soon as reasonably practicable after the later of (i) the Effective Date, or (ii) the date such Claim is Allowed. This Class is impaired under the Plan, and holders of Claims in this Class will be entitled to vote to accept or reject the Plan. Allowed Administrative Convenience Claims are estimated to total $262,474.50.

Holders of Claims in Classes 6 and 7 may agree to reduce such Claims to $7,5000 and elect  to have such reduced Claims be treated as Allowed Administrative Convenience Claims in Class 5 by so electing on the ballot provided for voting on the Plan (a "Convenience Claim Election").

8.    **Class 6, General Unsecured Claims**. Class 6 consists of General Unsecured Claims, as described on **Exhibit A**. Holders of Allowed Claims in this Class shall receive pro rata payment from Projected Disposable Income over a period of three (3) years, to be paid quarterly and commencing on the date which is three (3) months from the Effective Date. If this Plan is consensual, the payments will be made by Debtor; if non-consensual, the payments will be made by the Subchapter V Trustee.  Holders of Claims in this Class may also submit a Convenience Claim Election to opt into Class 5. This Class is impaired under the Plan, and holders of Claims in this Class will be entitled to vote to accept or reject the Plan. Claims in this Class are estimated to total $3,195,341.62.

9.    **Class 8, Equity Interests.** Class 8 consists of Allowed Equity Interests in Debtor. On the Effective Date, and provided that the DIP Lender exercises its Conversion Right by issuing a Conversion Notice, all of the existing and outstanding Equity Interests in Debtor shall be extinguished and cancelled; however, after the Effective Date, holders of Equity Interests will have the opportunity to subscribe for membership interests in the Senior Preferred Class in Debtor as reorganized, in accordance with Article IV, paragraph B3.  If the DIP Lender does not issue its Conversion Notice by the Conversion Right Deadline, then all holders of Equity Interests in Debtor shall retain such interests in accordance with the Debtor's governing documents. This Class is impaired under the Plan, and holders of Claims in this Class will be entitled to vote to accept or reject the Plan.

## V.     LIQUIDATION ANALYSIS AND FEASIBILITY

**A.     Liquidation Analysis / Best Interests of Creditor Test Satisfied**

To confirm the Plan, the Bankruptcy Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such creditors would receive in a liquidation under chapter 7 of the Bankruptcy Code. The liquidation analysis attached to this Plan as **Exhibit E** demonstrates that the Plan meets this requirement because creditors will receive more under this Plan than in a liquidation.

**B.     Feasibility / Ability to Fund Plan**

Debtor proposes to pay creditors from its Projected Disposable Income, which will be derived primarily from operational income, and, to the extent applicable, any proceeds from a sale of the Debtor's assets. Debtor believes the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization.

## VI.     ALLOWANCE AND DISALLOWANCE OF CLAIMS

**A.     Disputed Claims.** Objections to Claims shall be made only by Debtor. Debtor may, at any time up to the six (6) month anniversary of the Effective Date, file an objection to any Claim that in its opinion should be disallowed in whole or in part. The period within which to file such objections may be extended with Bankruptcy Court approval. The objection procedure will apply, without limitation, to Claims arising from the rejection of executory contracts and unexpired leases. Upon the filing of such an objection, such Claim will be considered a Disputed Claim.

**B.     Allowance of Disputed Claims and Payment of Distributions**. Upon the allowance of a Disputed Claim, by either compromise and settlement or by Final Order, prompt distribution shall be made to the holder thereof of the distributions to which such holder would have been entitled had the Claim been Allowed as of the Effective Date of the Plan, without interest. Future distributions on such Claim shall be made consistent with the timing and terms of distribution to other members of the same Class. No holder of a Disputed Claim shall be entitled to recover any distributions made to other holders of Allowed Claims regardless of any delay in obtaining an order allowing or estimating a Disputed Claim.

**C.     Reserve for Disputed Claims**. Debtor shall make an adequate reserve for all Disputed Claims. The reserved amounts shall equal the amounts that would be paid on such Claims if they were allowed in full.

## VII.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except as provided below, all of Debtor's executory contracts and unexpired leases that are not subject to a pending rejection motion as of the Effective Date, shall be assumed by Debtor. Assumption means that Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the

Bankruptcy Code, if any.  Debtor does not believe any prepetition cure payments are owed or will become due and owing in respect of its executory contracts and unexpired leases.

Debtor's assumption of executory unexpired leases with St. Charles Town Company Theater, LLC, Aspen GRF2, LLC, Union Station Alliance, LLC, and Stanley JV, LLC is subject to and expressly conditioned on modifications to such leases approved by the Debtor prior to the Confirmation Date.

All of Debtor's insurance policies shall be deemed and treated as executory contracts pursuant to the Plan, shall be assumed by Debtor, and shall continue in full force and effect thereafter in accordance with their respective terms.  All insurance policies shall vest in Debtor.

If you object to the assumption of your executory contract or unexpired lease or believe you are entitled to a prepetition cure amount, or object to the proposed cure of any defaults or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier deadline.

## VIII.   SUBCHAPTER V TRUSTEE

### A.   Consensual Plan

If the Plan is confirmed under 11 U.S.C. § 1191(a), the service of the Subchapter V Trustee shall terminate when the Plan has been substantially consummated.  Substantial consummation shall be deemed to occur upon the Effective Date of the Plan.

### B.   Non-Consensual Plan

If the Plan is confirmed on a non-consensual basis under 11 U.S.C. § 1191(b) with respect to Classes 5, and 6, then except as otherwise provided in the Plan or in the Confirmation Order, Debtor shall make all payments due under the Plan to holders of Claims in Classes 5 and 6 to the Subchapter V Trustee.  The following provisions shall apply to all Claims and disbursements made by Debtor with respect to Classes 5 and 6 under the Plan:

a.    Debtor shall file with the Bankruptcy Court, as a supplement to the Plan and provide notice to all creditors in Classes 5 and, 6 at or before confirmation, a list of all holders of claims in Classes 5 and 6, the total amount to be paid to each such holder under the Plan and the payment terms and schedule for each such holder under the Plan.

b.    Debtor shall timely make the payments due under the Plan to Classes 5 and 6 to the Subchapter V Trustee.  If Debtor fails to timely make any Plan payment to the Subchapter V Trustee as provided in this paragraph, the Subchapter V Trustee may file and serve a notice of delinquency upon Debtor and Debtor's attorneys. Debtor shall have 45 days from the date of the notice of delinquency to make all past-due payments due under the Plan with respect to Classes 5 and 6 to the Subchapter V Trustee, including any payments that become due within the 45-day period.  If Debtor is seeking to cure the delinquency in a modified Plan, Debtor must file a motion to modify the confirmed Plan within 45 days of the notice of delinquency.  If Debtor is not current

with payments under the Plan on the 45th day after the date of the notice of delinquency or has not filed a motion to modify within that time period, the Subchapter V Trustee will file and serve a report of non-compliance and may thereafter seek the dismissal or conversion of the case to Chapter 7.

        c.     All payments under the Plan will be made by the Subchapter V Trustee to the holder of each Allowed claim in Classes 5 and 6 and 7 at the address of such holder as listed on the Schedules or proof of claim, unless the Subchapter V Trustee has been notified in writing of a change of address.

        d.     Any payment required to be made under the Plan on a day other than a business day shall be made on the next succeeding business day.

        e.     Upon completion of all payments due under the Plan in respect of claims in Classes 5 and 6 and 7, Debtor may seek an order of the Bankruptcy Court confirming discharge of all Class 5 and 6 Claims ("Discharge Order").

## C.    Compensation

Under 11 U.S.C. § 330, the Subchapter V Trustee shall be compensated for services and reimbursed for expenses. However, the method of payment of the Subchapter V Trustee compensation depends on the provision under which the Plan is confirmed and the method of disbursement to creditors under the Plan:

**1.    Application to Bankruptcy Court.** The Subchapter V Trustee will apply to the Bankruptcy Court for an award of compensation through the application process that is used by professionals. The Subchapter V Trustee will file a final fee application for compensation to be heard with the other final fee applications in the case.

**2.    Confirmation on a Consensual Basis.** If the Plan is confirmed on a consensual basis under 11 U.S.C. § 1191(a), then the Subchapter V Trustee's services shall end with substantial consummation of the Plan under 11 U.S.C. § 1183(c)(1), and the Subchapter V Trustee may collect compensation for all services in an amount approved by order of the Bankruptcy Court. Substantial consummation of the Plan under 11 U.S.C. § 1183(c)(1) will be deemed to occur on the Effective Date.  The Subchapter V Trustee's allowed compensation is payable as soon as practicable after an order allowing the same becomes a final, non-appealable order, unless the Subchapter V Trustee agrees to different treatment.

**3.    Confirmation on a Non-Consensual Basis.** If the Plan is confirmed on a non-consensual basis under 11 U.S.C. § 1191(b), then the Subchapter V Trustee will remain in place until all payments have been made to unsecured creditors, and the Subchapter V Trustee may be entitled to additional compensation for services provided after confirmation. The Subchapter V Trustee may file fee applications throughout such period. Upon approval of the Subchapter V Trustee's fee applications in a non-consensual case, Debtor shall pay all fee amounts due to the Subchapter V Trustee as soon as practicable after the order allowing the same becomes a Final Order, unless the Subchapter V Trustee agrees to different treatment.

## IX.    <u>ADDITIONAL PROVISIONS</u>

**A.   Severability**

Any provisions that the Bankruptcy Court may determine which render this Plan unconfirmable may be severed or altered at Debtor's option. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**B.   Binding Effect**

From and after the Confirmation Date, the provisions of the Plan shall be binding on Debtor and all holders of Claims and Equity Interests, including their successors and assigns, regardless of whether or not such persons have accepted the Plan.

**C.   Captions**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**D.   Amended Claims**

Claimants shall not be permitted to amend or otherwise modify any Claim after the later of the Claims Bar Date or the Confirmation Date without the consent of Debtor. Any amendment to a Claim filed after the later of the Claims Bar Date or the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Subchapter V Trustee or Debtor unless the claimholder has obtained Debtor's prior written consent for the filing of such amendment. The Subchapter V Trustee and Debtor shall have no obligation to recognize any transfer of any Claim after distributions have started.

**E.   Contractual Relationship and Default Remedies.**

The Plan, upon confirmation, constitutes a new contractual relationship by and between Debtor and its creditors. In the event of a default by Debtor under the Plan, creditors shall be entitled to enforce all rights and remedies against Debtor for breach of contract, being the Plan. Any secured creditor claiming a breach of the Plan by Debtor will be able to enforce all of its rights and remedies under its security documents, including foreclosure of its deed of trust, security agreement, lien, or mortgage pursuant to the terms of such document. Any creditor claiming a breach by Debtor must provide written notice to Debtor of the claimed default, and the notice must provide Debtor with a ten (10) business day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan. Upon Debtor's failure to cure the default within such ten (10) business day period, the creditor may proceed to exercise its rights and remedies.

**F.   Discharge.**

    **1.   Consensual Plan.** If the Plan is confirmed under § 1191(a), then pursuant to § 1141(d), the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims, interests, and

causes of action against Debtor of any nature whatsoever (including any fees, interest, or expenses accrued on claims from and after the Petition Date), and liabilities of, liens on, obligations of, rights against, and interests in, Debtor or any of its assets or properties, whether known or unknown, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, interests, and causes of action, including demands, liabilities, and causes of action that arose before the Effective Date, and any liability to the extent such claims or causes of action accrued before Effective Date. On the Effective Date, Debtor, as it exists post-Effective Date will be discharged from any Claims, interests, and causes of action that arose before the Effective Date, as specified in § 1141(d)(1)(A) of the Bankruptcy Code, except as provided in subparagraphs 2 and 3 below.

**2.      Non-Consensual Plan.** If the Plan is confirmed under 11 U.S.C. § 1191(b), confirmation of the Plan does not discharge any debt provided for in this Plan until entry of the Discharge Order.

**3.      Exceptions to Discharge.** Notwithstanding the discharge provided in Sections K.11(a) and (b), Debtor will not be discharged of any claims: (i) imposed by this Plan; or (ii) of a kind specified in Bankruptcy Code § 1141(d)(6)(B).

**4.      Automatic Stay.** For the avoidance of doubt, if the Plan is confirmed under Bankruptcy Code § 1191(b), the automatic stay shall remain in effect until entry of the Discharge Order.

**G.      Exculpation. Except as specifically provided in the Plan, the Debtor's directors and officers (including interim or acting officers) serving as of the Petition Date and the estate professionals (including, but not limited to, Debtor's CEO, attorneys, and financial advisors and the Subchapter V Trustee), shall not incur, and are hereby released from, any claim, obligation, cause of action or liability, known or unknown at the time of Confirmation Date, to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission during and in connection with the Subchapter V Case, except for their gross negligence, willful misconduct, or actual fraud.**

**H.      Injunction.**

**1.      Consensual Plan.** If the Plan is confirmed under 11 U.S.C. § 1191(a), then except as otherwise specifically provided in the Plan or the Confirmation Order, all entities and persons, and any successor, assigns or representatives of such entities and persons, who have held, hold, or may hold claims, rights, causes of action, liabilities, or any other interests based on any act or omission, transaction, or other activity of any kind or nature related to Debtor or the Subchapter V Case that occurred prior to the Effective Date ("Enjoined Claim"), regardless of the filing, lack of filing, allowance or disallowance of such claim or interest, and regardless of whether such entity or person has voted to accept the Plan, shall be precluded and permanently enjoined on and after the date the Bankruptcy Court enters the Confirmation Order, from (a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Enjoined Claim, against (i) any assets of Debtor, (ii) any assets re-vested in Debtor, or (iii) Debtor;

(b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order with respect to any Enjoined Claim, against (i) any assets of Debtor, (ii) any assets re-vested in Debtor, or (iii) Debtor; (c) the creation, perfection, or enforcement of any encumbrance or lien of any kind with respect to any Enjoined Claim, against (i) any assets of Debtor, (ii) any assets re-vested in Debtor, or (iii) Debtor; and (d) taking any action whatsoever with respect to any claims against (i) any assets of Debtor, (ii) any assets re-vested in Debtor, or (iii) Debtor.

      **2.**    **Non-Consensual Plan.** If the Plan is confirmed under Bankruptcy Code § 1191(b), the injunction provided for in clause 2 above shall become effective upon entry of the Discharge Order.

**I.**    **Request for Plan Approval if Non-Accepting Class(es)**. Debtor requests that the Bankruptcy Court confirm the Plan notwithstanding the failure of any Class to vote to accept the Plan. Even if one or more impaired Classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting Classes are treated in a manner prescribed by § 1191 of the Bankruptcy Code. The Bankruptcy Code allows the Plan to bind non-accepting Classes of Claims if it meets all the requirements for consensual confirmation, except the requirements of §§ 1129(a)(8), 1129(a)(10), or 1129(a)(15) of the Bankruptcy Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan under the standard of § 1191(c) of the Bankruptcy Code. **Creditors concerned with how these provisions will affect their Claim should seek independent counsel, as the variations on this general rule are numerous and complex.** Debtor will seek the Bankruptcy Court's confirmation of this Plan in accordance with this paragraph at the date and time of the Confirmation Hearing without further notice to creditors or other parties in interest.

**J.**    **Retention of Jurisdiction**. After the Effective Date and until the case is closed, the Bankruptcy Court shall retain jurisdiction over this Subchapter V Case for the following purposes:

      **1.**    **Litigation.** To consider, act on, approve, enforce, or resolve any disputes involving causes of action which accrued prepetition.

      **2.**    **Claim and Equity Interest Objections.** To hear and determine all objections to the allowance, priority or classification of any Claim or Equity Interest and to extend the date or dates by which objections to any Claim or Equity Interest must be filed.

      **3.**    **Estimate Any Claim or Equity Interest.** To estimate the amount of any Disputed Claim or disputed Equity Interest and to establish the amount of any reserve required to be withheld from any distribution under the Plan on account of any Disputed Claim or disputed Equity Interest.

      **4.**    **Executory Contracts.** To hear and determine all applications for the assumption and rejection of executory contracts and unexpired leases that are pending as of the Effective Date and to hear all objections to Claims arising therefrom.

      **5.**    **Title to Assets.** To hear and determine all questions and disputes regarding all causes of action, controversies, adversary proceedings, and contested matters, whether or not pending as of the Confirmation Date, including the right of the estate to recover assets or subordinate claims pursuant to the provisions of the Bankruptcy Code.

**6.      Modifications.** To consider any modifications of the Plan and to remedy any defect or omission or reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court, including the Confirmation Order.

**7.      Settlement.** To consider, act on, approve, enforce, or resolve any disputes regarding the compromise and settlement of any Claim or cause of action by or against Debtor.

**8.      Execution.** To issue orders in aid of execution of the Plan as contemplated by Section 1142 and to adjudicate controversies arising out of the implementation of the Plan.

**9.      Tax Matters.** To hear and determine any tax disputes concerning taxes accruing prior to the Effective Date concerning Debtor's estate.

**10.     Other Matters.** To determine such other matters as may be set forth in the Confirmation Order or which may arise in connection with the Plan or the Confirmation Order.

**K.      Closing of Case.** If this Plan is confirmed under 11 U.S.C. § 1191(a), the Effective Date has occurred, and the Bankruptcy Court has entered an order on all fee applications, Debtor shall request the Bankruptcy Court to enter an order closing the case and the Bankruptcy Court may close the case if there are no pending contested matters or adversary proceedings. If this Plan is confirmed under 11 U.S.C. § 1191(b) and the Effective Date has occurred and all payments due under the Plan in respect of claims in Classes 5-8 have been completed, Debtor may request the Bankruptcy Court to enter an order closing the case and the Bankruptcy Court may close the case if there are no pending contested matters or adversary proceedings.

Dated: January 16, 2024

                              BENDED PAGE, LLC


                              By: _*s/ Bradford E. Dempsey*_____
                                    Bradford E. Dempsey
                                    Chief Executive Officer


**ONSAGER | FLETCHER | JOHNSON | PALMER LLC**

*s/ _Andrew D. Johnson*_____
     Andrew D. Johnson, #36879
     Alice A. White, #14537
     Gabrielle G. Palmer, #48948
600 17th Street, Suite 425 North
Denver, Colorado 80202
Ph: (720) 457-7061
ajohnson@OFJlaw.com
awhite@OFJlaw.com
gpalmer@OFJlaw.com
*Attorneys for Bended Page, LLC*

## LIST OF EXHIBITS

| Exhibit # | Description |
|---|---|
| Exhibit A | General Unsecured Claims |
| Exhibit B | Equity Interests in Debtor |
| Exhibit C-1 | Governing Documents – Form of Amended Articles of Organization |
| Exhibit C-2 | Governing Documents – Form of Second Amended and Restated Operating Agreement |
| Exhibit D | Projected Disposable Income |
| Exhibit E | Liquidation Analysis |

# EXHIBIT A

## General Unsecured Claims – Class 7

### Lease Claims

| Name of Landlord | Location | Claim Amount |
|---|---|---|
| St. Charles Town Company Theater, LLC | Colfax Ave., Denver | $21,457.82 |
| West Lot, LLC | McGregor Square, Denver | $40,000.00 |
| Aspen GRF2, LLC | Aspen Grove, Littleton | $67,083.66 |
| Union Station Alliance, LLC | Union Station, Denver | $9,912.30 |
| Stanley JV, LLC | Stanley Marketplace, Aurora | $8,358.13 |
| The BCIG 112-114, LLC | Colorado Springs[10] | $0 |
| Thrash Retail, LLC | Westminster | $204,750.00 |
| | **TOTAL** | **$351,561.91** |

### Large Publisher Claims

| Creditor Name | Claim Amount |
|---|---|
| Ingram Book Group, LLC | $347,564.97 |
| Penguin Random House LLC | $399,422.52 |
| MacMillian Pub Sev dba Holtzbrinck Pub LLC | $233,677.37 |
| Simon & Schuster | $252,845.45 |
| **TOTAL** | **$1,233,510.21** |

### Former Owner and Manager Claims

| Creditor Name | Claim Amount |
|---|---|
| TC Incorporated | $192,500.00 |
| William Kwame Spearman | $242,476.67 |
| William Kwame Spearman | $225,000.00 |
| Len Vlahos | $36,792.34 |
| Kristen Gilligan | $26,541.67 |
| **TOTAL** | **$723,310.68** |

---

[10] Debtor's former Colorado Springs landlord appears in its records as Zephyr Enterprises LLC.

**Unredeemed Gift Cards Claims**

| Creditor Name | Claim Amount |
|---|---|
| Unknown Holders of Unredeemed Gift Cards (unexpired and unredeemed) | $103,493.53 |
| Office of the State Auditor | $375,536.82 |
| **TOTAL** | **$479,030.35** |

**Other Unsecured Claims**

| Creditor Name | Claim Amount |
|---|---|
| Great American Financial Service Corporation | $43,373.07 |
| Ogletree Deakins Nash Smoak & Stewart PC | $24,473.00 |
| Harper Collins Publishers | $24,271.10 |
| Aurora | $10,382.09 |
| Notes & Queries, Inc. | $7,886.26 |
| Pomegranate | $7,817.95 |
| Nelson Line "Sidelines & Cals" | $7,795.00 |
| Authentic Cards | $7,678.00 |
| Denver Post 167206 | $7,628.00 |
| Oracle America | $7,542.00 |
| Payne Publishers Calendars | $7,531.00 |
| Kaiser Permanente | $19,594.00 |
| Lonely Planet Publications | $20,315.00 |
| Scholastic Inc. | $24,798.00 |
| Workman Publishing Co Inc. | $28,079.00 |
| Alpine Press | $28,674.00 |
| Houghton Mifflin Harcourt | $28,720.00 |
| W W Norton & Company Inc. | $35,913.00 |
| Hachette Book Group | $65,458.00 |
| **TOTAL** | **$407,928.47** |

**Total General Unsecured Claims: $3,195,341.62**

## <u>EXHIBIT B</u>

**Equity Interests in Debtor – Class 8**

See attached list of holders of preferred Class A and common membership interests

# **EXHIBIT C-1**

**Form of Amended Articles of Organization**

See attached.

## EXHIBIT C-2

**Form of Second Amended and Restated Operating Agreement**

See attached.

# **EXHIBIT D**

## **Projected Disposable Income**

See attached. TBP

## **EXHIBIT E**

**Liquidation Analysis**

See attached.  TBP